UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

DONALD PARKELL AND THE MEN INCARCERATED AT THE SUSSEX
CORRECTIONAL INSTITUTION (SCI)          Plaintiffs;

v.

WARDEN CERESINI, STAN TAYLOR, JOHN DOE 1 THROUGH
100 **25-593**         Defendants.

**FILED**
MAY 12 2025
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

JURY  TRIAL  DEMAND
CIVIL  ACTION  NUMBER
_____

MAY ___9TH___ 2025

1. Sussex Correctional Institution (SCI) is located in George-
town, Delaware. It is one of 3 level 5 mens prisons.
Every level 5 facility also houses pretrial detainees.

2. Every level 5 facility follows policies of the Del-
aware Department of Corrections, with the facilities' own
site specific practices and customs.

3. Warden Ceresini is the SCI Warden. He is
sued in his individual and official capacities. He
is the boss at SCI, and only answers to the DDOC
Commissioner.

4. Stan Taylor is the DDOC Commissioner. He is
the boss and final authority over all Department of
Corrections facilities.

5. This is a 42 U.S.C. § 1983 civil complaint

ONE

filed as a class action & committed violations of the 5TH, 8th, 1st and 14th Amendments of the United States Constitution, against the 2 subclasses of the full class. The 2 subclasses are:

A: Sentenced Inmates, at SCI,

B: Pretrial Detainees, at SCI.

6. The Corrections department in Delaware is operating under a military-like ranking system in which employ-ees attain rank designation based on their seniority (time spent on the job) criterion, and secondly, a basic knowledge test for the position sought. The tests are remedial at best.

7. Ranks available as approximately ten distinctive names, including Sargeant, Lieutenant, and Captain.

8. Nothing prevents promotion in Delaware Corrections as employees with histories of violent abuses are still employed, and achieve promotions, arguably even faster than less abusive workers.

9. The entire ranking ideal is an absolute mock-ery of the Honorable American Military, akin to a game played by children. No deserving employee exists in correc-tions that befits the title of "Captain", or "Major". It would be a laughable suggestion if it weren't such a serious danger to so many people.

10. The foundational image of military beauty, with

TWO

precision, courage and respect that is any American unit, Battalion, Division, even class of cadets after bootcamp is unparalleled. Simply assigning an employee with rank imitating the American Military is either childish, criminal, or disrespectful.

11. Self appointing rank is the hubris of criminal organizations. Mafia families, gangs, etc. bye to be introduced as a ranking title. However, it is still just make-believe.

12. The military ranking mockery is the bedrock foundation of exactly what is wrong in Delaware Corrections.

13. Men and women have fought and many lives have been lost in pursuit of American Freedoms. To have the audacity as an actual governmental agency to use military ranking and insignia is outrageous. Corrections as a branch of government is the antithesis of freedom (albeit, necessary). To signify oneself with stripes or bars befitting servicemen is flat out the foundation of the hubris of the cultural poison.

14. The plaintiff representative Boskell (P.R.) has litigated against the DDOC for nearly two decades. His pursuits provide checks and balances, but are limited by his own ability, perspective, and/or resources.

15. The P.R. has investigated, litigated and dug as deep as he could manage to come to the stage

THREE

that he is now confidently ten toes forward. Although not an actual attorney, he has found purchase in the battle to make the DDOC safe, constitutionally sound, fair and with strong rehabilitative influence.

16. The DDOC and P.R.'s dynamic in civil litigation began in earnest aggression, with the DDOC not willing to admit even the slightest error. P.R., likewise, found himself to be a champion of the oppressed, wishing to defeat the DDOC in spectacular fashion.

17. P.R. has outgrown that approach, now seeing the DDOC as not merely an adversary, or antagonist, but as a potential ally which is the primary reason that redress in this current action is structured so.

18. The DDOC is at a defining moment in history. On one side of judgment, it could be forever known for failures of the first order. If given any audience with open willingness to truly address the flaws in the Department, DDOC could be known for its innovative decisions and take its place in history as "The First State" to reimagine corrections for the betterment of society.

19. By the end of this complaint, P.R. seriously believes that the DDOC will no longer envision

FOUR

him as an adversary either.

20. The DDOC was the main entity affected by a hostage crisis in February 2nd, 2017. This crisis cost an employee his life (Stephen Floyd), many other individuals were held against their will (over 100), and two other correctional officers were seriously injured.

21. One female counselor was taken hostage. This woman was an older lady, and not athletically stable. Her ordeal was extremely traumatic, but tempered by P.R., who was also one of the hostages.

22. Within the barricaded building at JTVCC, P.R. and two other men insulated 'themselves' with Patricia May for the sole purpose of guarding her life and dignity. P.R. and the 2 others were of an agreed, uniform decision that they were willing to die for her that day and night (and following day).

23. After the extreme event, P.R has been diagnosed with crippling PTSD, but regrets only one thing from that ordeal, that he did not also try to save the life of Steven Floyd as well.

24. If not for the aggravating factors found and described later, known now as a poisoned culture at JTVCC, plaintiff would likely have had

FIVE

the integrity and courage to influence preservation of Floyd's life. However, he was under the same affected cultural poisoning that was found to be the motivating principle of the crisis.

25. Plaintiff has familiarity with the criminal justice system in Delaware since he was 12 years old. As a result of his experience, his morality has been influenced by the DDOC as a primary influencer.

26. Plaintiff has long struggled to find the purpose in ethical living that can join his own experience to right wrongs that his perception leads him to believe are capable of correction.

27. Plaintiff began his journey in Constitutional litigation in this Honorable Court in or around seventeen years ago. Throughout the ensuing years, PR was focused primarily on identifying singular conditions of confinement, and seeking redress for individual acts he was subjected to personally.

28. As his eye for the unconstitutional conditions was sharpened, slowly he perceived a new category of injury; the possibility of risk. Foresight took root and PR developed an ability to see the problematic probabilities as they

SIX

approached the critical stage, where injury be-
came inevitable, but there still existed the
time to prevent injury, where risk still
could be treated, and thwarted.

29. P.R. was not capable of sounding the
clarion to warn with precision, because he
was still impartial in his litigation, was
not capable of delivering warning with a per-
ceived antagonist. The DDOC likewise was not
capable of perceiving the warning, due to
the flaws of their own culture. P.R. here,
with this Complaint, is engaging the first
communique neccessary to waive the proverbial
flag of friendship. So although this operative pleading
is seeming to eviscerate the DDOC, it is
done so with the best of intentions.

30. This pleading highlights the cultural poison.
While the most affected and darkened individ-
uals are likely to push back, just as has been
par for the course for the past court battles of
civil accord. The most comfortable abusers will
desire to fight tooth and nail, and willingly
forfeit the Delaware tax-payers' coffers along the
journey of clutching their right to oppress with
impunity. To this, it is only fair that P.R.
points to the '3 most convincing and
compelling reasons for collaborating with
the p.r. for purposes of commonality:

SEVEN

A. The p.r. is far too skilled in the areas of prisoner's rights to be taken as lightly as in past litigation. Simply opposing the p.r. for no true reasons other than to oppose is a bottomless money pit. This would be morally defensible if the p.r. were seeking an obscene redress, or frivolously or maliciously litigating for reasons of ill-repute. The resources that will be used to oppose this complaint will be vast and disproportionate to the desired outcome as a relief.

B. The sealed nature of this complaint is a gesture of integrity on p.r.'s behalf. There is no desire to expose the many proofs uncovered, or to over engage with the various media platforms that p.r. has the interests of. Delaware is home to p.r. and he has no ill intent to ~~trouble~~ expose, embarrass or uncover anything distasteful if it can be avoided.

C. The outcome of the sought relief is mutually beneficial. In fact, the DDOC is the absolute beneficiary in a cooperation along the suggested lines. If all things are to be addressed that are poisoned, the DDOC will stand proud, head and shoulders above the other corrections departments in the 49 other states.

EIGHT

31. There are many other reasons why cooperation is desirable.

32. After first litigations, p.r. came to realize that he had a definite skill in motion practice, the usage of discovery tools, drafting complaints generally, and even navigating the appeals process. P.R., for his part, was not blinded by his own achievements or successes in this Court (or the 3ʳᵈ Circuit).

33. With these realizations, a certain level of responsibility drives pr's choices in the present action.

34. After the 2017 crisis, the Delaware Governor assembled a Task Force with the goal to find out what the underlying reasons were for the Uprising to occur. What was produced from the task force was 2 reports, one preliminary one and one called the Final Report.

35. The very culture of the JTVCC was thoroughly examined once the crisis was quelled. Everyone wanted answers. The findings of the 2 reports were flawlessly accurate and highly instructive: JTVCC was the victim of a poisoned culture amongst staff. The cultural poison permeated so many vital operational functions that the overall behavior of the correctional officers was the primary cause of the crisis.

NINE

36. DDOC saw the crisis, as well as the task force findings, as an opportunity to address the culture of abuse, disdain and indifference at JTVCC. For the most part, it appeared to have made a great difference, as they tackled the issue head-on, and identified problems and solutions. A much safer environment was beginning to emerge, and proactive foresight finally became a possible, as opposed to first requiring an incident, as what happened in JTVCC.

37. The dynamic between officers and offenders was noticeably improving. Up until the task force findings, the officers and offenders were both fed unnecessary lies and dealt with each other as adversaries. This was not as pronounced in the months following the findings. A modicum of respect began to take shape, but this was not permanent.

38. Cancers, infections, and other insidious things must be completely eradicated, or they return with vigor. The same is true with a poisoned culture at work. The nature of a hateful antagonism towards the employees' subject matter at work breeds a branching nexus of problems. If corruption spreads, it does so with disgusting efficiency.

39. Blame is plentiful. The officers cannot be solely blamed as culprit. Their attitude is a byproduct of a much larger issue that requires a more exacting audit. They have been trained to despise offenders

TEN

in order to do their job correctly. The standard defense in abuse claims is typically "I was only following orders", but history shows this defense as baseless, as was cogently shredded in the Nuremburg trials. There are quite obvious and ethical limitations.

40. Taken as individual, isolated incidents, most abuses simply fall short of properly pled complaints, where a claim must allege the requisite elements. This is not the same when totality of the conditions is pled. In light of the 2 reports filed by the 2017 task force, when incidents in Delaware are considered in the aggregate, especially considering pr's unique position, the culture having been properly framed by subsequent task force findings, the culture is now a known risk for the immediate screening of this pleading.

41. As mentioned above, the uniquity of perspective of p.r., correlated with the requested relief, it is central to label this pleading as fortunate. The DDOC is very fortunate, to be at the cusp of change with PR in the moral standing he champions. This 'fortunate' moniker is because DDOC now will be given the opportunity to prevent another crisis. This is not exaggerated

42. Packell is seeking through the vehicle of 42 U.S.C. § 1983 a means to prevent the inevitable catastrophe

ELEVEN

that is circling the sky above SCI.

43. P.R. was the only person that was not involved in the murder of Stephen Floyd that could have prevented his demise. He did nothing to prevent his murder.

44. Taken hostage on Feb. 2, 2017 P.R. fought to keep the counselor safe. 19½ hours of hell. P.R. is haunted daily by decisions made that day.

45. Prior to that day, all the way back to the time plaintiff was in trial for the sentence he was serving when the crisis occured, he had a moral awakening right on the cusp of acquittal. P.R. was just a motion away from acquittal when his entire life changed in a way that motivated him to ask the judge for life imprisonment right there in the middle of trial, just before a motion for judgement for a notion of law would have freed him. His decision was absolute.

46. The judge, after questioning his sanity, and also with a suspicious eye, decided that plaintiff's remorse was unprecedented and only sentenced him to just about twelve years, stating that he may be supposed to be in prison for some reason, but she was not giving up completely on him.

47. The trial judge exhibited in retrospect an eerie

TWELVE

premonition of purpose. If not for the P.R. quitting in the middle of a certainly winnable trial and receiving level 5 jail time, P.R. would not have been at C-building on Feb. 2, 2017 to shield Mrs. May.

48. These facts are routinely pondered over for P.R. To describe his view being changed by these events is not giving the weight it deserves.

49. Plaintiff chose not to intervene to save Floyd's life. As such painful guilt has demanded every inconsequential decision be heightened, so Parkell begs the incoming crisis, as a direct result of officer culture at SCI, be prevented.

50. A receptive audience is needed to stop the disaster. P.R. in no way brandishes his unique position as a weapon, he offers an olive branch.

## EXAMPLES OF RANDOM PROOF

51. There are an unending number of examples of dangerous culture in the SCI corrections staff. In all staff, actually. The aggregate of these conditions needs to be kept in mind on totality.

52. As the P.R. is now participating in a drug and alcohol program, he can start there.

53. The program is called "The Road To Recovery.

THIRTEEN (A.)

FILED

MAY 1 2 2025

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

B

25-593

54. R2R is a final stage (or track) level 5 program that follows the therapeutic Community operating guidelines in which the offenders have to run the day to day scheduling in a structured way that emphasizes the accountability and job position elements of typical TC's like the 'KEY' and 'CREST'.

55. In any given day at R2R, upwards of ten staff members come to work at SCI to put in up to ten hours to make honest efforts in counseling, peer support, as supervisors as well as director, getting paid substantial wages, all in the name of helping men with addictions find answers to defeat their dependences, and more importantly, not commit new crimes upon re-entry into society.

56. These dedicated men and women understand the importance of such work and create structure for PR and his peers to follow in the aim of accomplishing these goals.

57. The day at R2R in SCI typically follows this basic format:

    A. Morning Meeting;

    B. Meetings of different distinctions throughout the day;

    C. Groups based on counselor case loads, track level, or phase or track;

FOURTEEN

D. Evening Meetings:
E. Weekend groups have separate distinctions;
F. Once weekly larger groups are held for overall issues.

58. The Counselors at R2R conduct their own set group called "caseload" in which offenders are all assigned a counselor who manages their case, with groups held specific to that counselor's design schematic.

59. Upon sentence from criminal court, or by classification, an offender is transferred to one of the level 5 facilities and if classified to R2R, entered into the program at the facility.

60. Track one is the most intense, track three is least. The full range:

A. Track Four (AKA Reflections): typically 3 months (90 days);
B. Track Three (90 days)
C. Track Two
D. Track One
    i. Phase One
    ii. Phase Two
    iii. Phase Three

61. P.R. is a classified entrant, on track three. He has been participating since March 30, 2025.

FIFTEEN

62. The R2R at SCI is held and housed in the Stan Taylor building. PR is housed in there or "D Quad".

63. Stan Taylor building has 4 quads, each designated by a letter to specify which quad is in focus. The quads are A, B, C, and D. R2R is only installed on C and D quads.

64. R2R is 24 hours every day. There are a lot of times when everything is relaxed, typically at night, but it is never completely off.

65. A TC works by mimicking an employment ladder. Functions are identical to jobs, except no offenders get paid for any titles in the program.

66. Counselors, peer specialists, supervisors, and directors are not offenders. They go home, they are paid just like other staff.

67. The morning meeting is held at proximately 9:00 am. This occurs just after "bed-check", where one peer specialist along with an offender with a peer support function both walk through while every member stands at attention at the foot of their beds, with beds made.

68. Morning meeting then takes place with about ten individuals having assigned tasks to complete in meeting.

SIXTEEN

69. The ten people pick or call volunteers to talk about those tasks (3 each) and many other issues are discussed and take place. Morning meeting sets the vibe for the new day, with the R2R director and Supervisors having laid out in detail what is expected.

70. The meeting itself is a positive sight to behold. It evokes brotherhood, neighborly affirmations, cheering for collectively fighting the serious addictions, and more.

71. The illusion is that the TC is self governing but this illusion only works when the DOC staff on duty is mature enough to handle that.

72. Delaware (and the (United States broadly) has built a steady and increasing focus on the issues surrounding addiction. Uncountable studies have been made, townhalls, legislature, outreaches, advocacy, the list goes on and on, for the need to address such a powerful topic.

73. Drug addiction causes many issues to spiral out of the addict's control and evil actions are made in the pursuit of getting American citizens clean. Crimes, victims, murders, rapes, mental health crisises, gang war, mafia elements, etc, are all tangibly measured with drug addiction measuring units.

SEVENTEEN

74. An enormous amount of money is channeled to address drug addiction in Delaware. This is done with a near-unanimous voice, as the drug crisis has touched all of us in some way or another.

75. The culture of officers in SCI sabotages all efforts in the facility. As a culture is not an aware entity, and thus does not make conscientious decisions, these individual officers know not what they do, so individually, outside of the aggregate, without introspection of the officer, due to the absence of any critical observance other than the totally offended, these officers are left to their own devices, and thus attain the requisite knowledge

76. Any honest audit would reveal the idiopathic nature of the sabotage. As the morning meeting begins in all its attentive splendor, the energy feels positive, with an aura of hope shining through the encasement of the DOC's shell of imprisonment.

77. For a few early minutes, the PR and his peers believe that they are capable of winning this fight against their addictions. Then, it abruptly is destroyed: "This is where the crackheads manipulate their way out of prison." (an actual quote from officer Redman to new shadow cadet Gonzales this past week during her "training".

FIGHTEEN

78. "Oh?, How so?" Gonzales responded to officer Redman. "They pretend to care about things other than themselves. They don't care about anything except manipulating us out of whatever they can. I've been here long enough to tell you, they can't change because they're all scumbags". Redman made sure he said this at the moment that one of the tasks that was being fulfilled was asking for a moment of silence to be in remembrance of loved ones who passed in each of the program members lives.

79. The statement is instructive. First it is the very real belief that every offender is scum here at SCI, and incapable of rehabilitation. Flying in the face of the very name of which the officers take their make-believe ranking from: - Corrections. That which cannot be corrected should not be under the supervision of someone who doesn't understand rehabilitation.

80. The entire R2R must defer to DDOC for any existing dynamic mandates that DDOC is unequivocably above R2R in all respects, as the offender is in a prison.

81. The officers routinely turn their computer monitor volume up whenever any meeting is taking place in order to subjugate the other

staff, who are counselors and there to help offenders. It is also meant to subjugate the offenders, but more so as a culturally poisonous spread in officer supremacy.

82. The need to screene its sanctimony to every possible witness pounds at the id of the officer at SCI. Just as the ego of the JTVCC officer prior to the crisis led officers to assert dominance of every offender, at every opportunity, in disrespectful ways, as humiliating as possible, in an ever increasing fashion, the culture now mirrors that abusive culture.

83. If A = B, and B = C, then C must = A according to mathematical certainty.

84. If officer culture caused the JTVCC crisis, and officer culture is identical to the JTVCC officer culture at SCI, then the SCI culture will cause a crisis, at SCI.

85. As the R2R daily morning meeting ends, after multiple disrespectful interruptions, the positive belief for the possibility to conquer one's addiction properly thwarted, the day at R2R begins.

86. A barrage of insults, threats, strip searches, and one-a-whim abuses are sprinkled liberally throughout the daily R2R message of self

TWENTY

respect, positive affirmations, and self-accounting. The culture of officer at SCI simply will not stand idly by as men attempt to succeed in life.

87. As was tone of a culturally poisoned dynamic at VTVCC, so is it at SCI, which is exhibited in these every single opportunity to engage with the offenders. Nothing short of physical threat, scathing remarks with the inflections of the disgusted.

88. Aside from the complete disrespect, there are practices at SCI that also must be added to the collective. This is not in any way diminishing the level of verbal abuse, PR will revisit that later.

89. The R2R, as noted earlier, is in the Stan-Taylor building. This building is dormitory styled for housing with open bunks doubled into bunk beds, with no cell walls. Simply open floor housing, with communal showers/restrooms.

90. A daily opportunity for exercise/recreation is provided for all offenders at SCI.

91. The SCI has a gymnasium and a yard. These areas are available once per day for the R2R men. As such, the officers announce the "gym/yard" and offenders must immediately

TWENTY ONE

line up, they then pack into a small sallyport that is abusively used. The men are forced to pack into the sallyport, thighs to hamstrings, backs to other men's fronts. This is completely and utter danger in level 5 prisons, for numerous reasons, Prison Rape Elimination Act (PREA) violations for one, fire code risks, and health dangers. People could stab others and never have any proof of who did it. A fight will break out, or a medical emergency.

92. In SCI the officers have created a means of racketeering, in which mattresses are unsewn, the stuffing is removed in substantial amounts, and the offenders are then informed that they can instead of using the issued mattress, choose to buy a better mattress for almost two hundred dollars. This is seemingly unbelievable, but when culture permeates as deeply as it has in Delaware, things as obviously illegal as commercializing required amenities isn't such a stretch.

93. If the defendants are permitted to simply commercialize required amenities, it encourages the slippery slope of abuse into other easily exploitable rights, such as diet. A foul smell or taste could be added to the drinking water or the starch in prepared foods, requiring pre payment for

TWENTY TWO

"premium diet", that which has not been tempered with. Or possibly half-blankets or cold showers, requiring pay for the hot water usage. A slippery slope indeed.

94. No shortage of ideas exist for abusers bent on exploitation. No real need to describe in vast paragraph count is needed either, this Court surely receives the point well.

95. The SCI also has terrible abuses that have generalized in the pre-trial areas of the facility. These abuses are disturbing, and are centrally motivated by officers who truly harbor sadistic ideations.

96. The pre-trial area houses men who should be given even greater constitutional protections when detailing the reasonable expectations of safety. These people have not been found guilty of any crimes, and are not guaranteed to ever be. However, guards with propensities to abuse gravitate towards the pretrial areas to work their shift.

97. The allure of pretrial is in the relative acceptable use of chemical agents in extremely disproportionate and unnecessary ways. There are hardly any excuses for the amount of incidents in which chemical agents

TWENTY THREE

are deployed, let alone why known abusers of the chemical weapon option are still permitted carte blanche when identified as abusive.

98. The abusers are given carte blanche because the culture of abuse is poisoned in that far and deep.

99. The supervisors who should prevent the abuse when alerted to it do nothing, and the officers who report their co-workers as abusive are ostracized and put into very dangerous positions.

100. Many of the culture from JTVCC who were known abusers have migrated to SCI some assuming the position of investigating officer misconduct. It is the old adage of the fox guarding the hen house.

101. The 2017 crisis was instructive on what is a poisoned culture, and how interactions among corrections staff and offenders can create untenable situations. It mislabelled the culture as site-specific, when in fact the DODC was too site-subjective. Any officer can and likely has worked in more than one of Delaware's facilities.

TWENTY FOUR

102. In an employ, good people can falsely believe that the evil actions they commit are required and necessary to ensure the requirements of the job are fulfilled. Dr Phillip Zimbardo coined this as "The Lucifer Effect".

103. To fully appreciate the Lucifer Effect on the Delaware Correctional Employee it must be noted that the very top of the employment in DDOC at the time were the Commissioner and JTVCC warden. The two at the time set about actively sabotaging the safety of the facility in order to prejudice a lost Court case. A despicable fact, and a classic example of corruption on high. It is a first, where such an action was not believed to be possible. It will only get worse. The culture has thrived at JTVCC. "Oh what a tangled web we weave"

104. The daily staffing is a much more desperate group at SCI, then one that should have their lives of no consequence to individuals who are taking pleasure in spraying caustic chemicals on men, because he took an extra 5 seconds to hang the phone up, or not shut his cell door exactly on the moment, or some other easily mitigated scenario.

105. All of the dangers in a prison culture have the added effect of compounding that

risk to these free employees because

A: These employees don't know that they are thought of as bait;

B: They believe the officer will keep them safe;

C: Their work is undermined;

D: The officers are not courageous in an event of violence in a coordinated attack, they only train for overwhelming odds in their favor.

106. The hostage takers in 2017 compiled a kill list. Only one of them was killed, the rest spread out into other institutions and contributed to the poisoning.

107. Where there was once a brave confidence, now morale in officers is a boiling hatred. The old blind courage, brazen for being unchallenged, is now tempered by the crisis and death. So the release of anger brings about a sneaky danger that exhibits itself in cowardly avenues, because the abuser does not want to answer for his abuses except when he feels the company is of the same mind.

108. The illusion of safety in level 5 facilities shattered when the first responders turned tail at the sight of inmates pushed to their

TWENTY SIX

breaking point.

109. The SDOC temperament is akin to the bully in the schoolyard. When he finds himself on his rear, crying into his hands, he is confused seeing a smaller child standing there not afraid.

110. That bully will look for softer targets. Hence he will look to other kids (think SCI). Once he finds his softer target, he will again become abusive, as it is his nature.

111. The infection has returned, and now the cancer has metastasized.

112. The gulf grows, and the beliefs of the two sides widens. There is no respect and thus no safety. The officer is empowered by a lack of accountability. The offender deepens his antagonism of authority and when the next crisis occurs, which it undoubtedly will, the dynamic between offender and officer will be much worse, making the inevitable fallout much worse. Will anyone place themselves in the line of fire for a staff member? Doom looms, and these nasty pompous officers should be ashamed at the risks their schoolyard bullyhood is placing of so many naive and unprepared.

TWENTY SEVEN

co-workers.

113. The nurses even show an uncaring indiff-
erence because all they see is disrespect. If the
guards disrespect the obtendees, then why should
they care about their privacy? This leads to
such lazy HIPPA violations as simply placing the
medication checklist for obtenders directly in the
common view of all obtenders as they receive
medications. Anyone can read the medications
that others receive, with the list in plain
view at the medication window, an open
fixture for distribution. The culture does this.

114. Even the church staff seemingly feels that
basic First Amendment principles are not appli-
cable or can be applied unequally at SCI.
Examples:

A. Jewish service is done through
a zoom conference connection. The SCI
chaplain sets it up and a rabbi gives
a sermon. This is done with a weekly
Friday service that is interrupted halfway
in with a warning that blocks the Rabbi's
face and asks for the chaplain to simply
click ok. He was told twice by PR,
and both times PR was ordered by him
to go sit down. The service got dis-
connected, and once again, someone's
time isn't valued despite the Rabbi

also being free.

○ B: Anyone who informs the chaplain of their need to eat kosher is thwarted despite their having informed the chaplain of the need. DDOC policy expressly states that all that is required is the inmate self report and the diet is approved in 24 to 48 hours. The culture does this.

115. As a basic rule of logic, it serves great progress to truly analyze the ranking structure within the corrections employ. Itemized bullet points follow:

· Military installations are for combat purposes.
· Combat involves two distinct opposing forces.
· Military forces invade countries, and they liberate them as well.
· If there were just one United World, no military would exist, only criminal justice.

116. Above points are simply too vast to keep adding, so the argument can be simplified thus. If correctional employees are given military ranks then the offenders would be naturally viewed as enemy combatants. When a corrections employee is hired and given rank, he or she sometimes have real military experience in combat. The entire culture of abuse can

TWENTY NINE

be connected to the subconscious influence and impact that having military titles handed out creates in a person.

117. Many individuals seek employment in the field of corrections that have recently served in the Armed Forces.

118. Service is honorable. It is using ones own life, body and mind in the full purpose of the country, to fight to the death if required the United States' enemy on the battlefield. It evinces a courage to charge into the enemy fire, to traverse the enemies' soil or evade his soldiers.

119. The military rank and file is instrumental in the battle, where lives are lost every day, and decisions are made that cement the legacy of American values.

120. The bravery of the military conflicts open our values of individual freedoms on foreign soil, they have an amazing ...

121. There is no enemy of corrections foreign or domestic *Emphasis added for effect.

122. Offenders aint the corrections officers' enemies.

THIRTY

123. Prisons are not meant for liberation, nor for invasion.

124. Prisons are on American soil already.

125. There is no opposing military inside any jails or prisons.

126. The entire disposition of a person with military ranking is artificially biased in the direction of superiority, as the fact is solidly de-wrote that American forces are indeed supreme in this world.

127. Just as in war, there are war criminals. The military justice system is full of examples of men and women whose behavior spiralled into dishonorable directions. Abuses are common where culture of a unit is tainted, or the personality of the servicemember is that of an abuser, or a bully and that person is left to their own devices. Much more is a factor when that individual is not in a position to focus that abuse on an American enemy. That focus then falls into the lap of those that are unwittingly viewed as enemies, when in all actuality they are American citizens, the plaintiffs here.

128. Without any enemies, the inclination is

THIRTY ONE

powerfully demanding a replacement. As the culbase is already solidly pointed towards disdainful opinions, the men housed at SCI are the convenient and also weak target for the bullying abuser who subconsciously believes himself a person befitting of military rank.

129. This fatal nexus compounds the abuse. The plaintiffs receive the military targeting as an enemy, as well as the culturally pointed weaponry of Delaware corrections.

130. SCI is not identically poised as ITWCC was in 2017, it is in fact much further along. The only reason ITWCC exploded before the same depth of ethical deficiency that SCI is now is due to the intentional tampering and sabotage by the officials then. It is truly just a matter of time.

CONSTITUTIONAL VIOLATIONS.

131. The defendants herein are sued individually and officially as capacities accountable.

132. John Doe defendants are numbered 1-100 for expeditious convenience and efficiency. Each defendant can be named. However due to the sealed nature of this Action P.P. hopes and prays that belief of identity

THIRTY TWO

upon Discovery will be unnecessary and this case finds a early abeyance with the objectives aimed toward mutuality.

133. The defendant John Doe #1 committed an Eighth Amendment violation against al sentenced plaintiffs by willfully subjecting them to maliciously indifferent risks when he required the entire R2R program at SCI to first pack into a locked area of such insufficient space that nearly 100 maybe more inmates were forced to press their thighs against the man in front of them's hamstrings, with a man also doing the same behind him.

134. These men have wall to wall physical body contact just so they could exercise their right to go to the exercise areas or recreation. If one didn't want to be subjected to these conditions, he was not permitted to go.

135. The risk of sexual exploitation violates the 8th Amendment

136. The risk of medical emergency in such conditions violates the 8th Amendment.

137. The risk of assault and battery violates the 8th Amendment

THIRTY THREE

138. The risk of fire emergency violates the 8th Amendment.

139. The John Doe Defendant Lt. Doe #2 violated the plaintiffs' 8th Amendment rights by failing to fix the issue of packing men into the dangerous conditions when made aware of the same conditions every day by a multitude of plaintiffs' complaints. He not only failed to intervene, but he also required the conditions himself when he was on duty, when his authority discretion and duty was to protect the plaintiffs from these abuses.

140. John Doe Defendant #3, Captain Doe also violated the 8th Amendments of the class of plaintiffs by failing to issue a directive eliminating the above conditions for GYM/YARD. His duty to protect the plaintiffs is one not solely predicated on grievance response, therefore he must act without requiring complaint.

141. Defendant Ceresini violated the plaintiffs' 8th Amendment Rights by failing to address the officers' conduct concerning the sally port in the STAN TAYLOR building. He was aware of the risks

142. John Doe defendants 11 through 31 all

THIRTY FOUR

violated the plaintiff class' 8th Amendments by subjecting them to violations of PREA, fire code, reasonable safety, medical risks, and overcrowding when engaging in a self-decided and on site practice of forcing the plaintiffs into a room too small for safety where sex-offenders mingle, and there are mentally ill individuals who prey on the sally port as an opportunity to cause humiliation, degradation and exploitation.

143. John Doe Defendants 32-42 each violated the Plaintiffs 8th Amendment rights by consciously tampering with the mattresses and thus denying them the option of buying exclusive, untampered with mattresses

144. John Doe defendants 1-100 all violated the plaintiffs' 8th Amendment rights by using these mace restraints in abusive ways. Each episode of the use of these chemicals was done without any attempt to deescalate the situation.

145. John Does 1-100, Warden Cenesin and Star Taylor each perpetuated a violent risk of harm by failing to address cultural poisoning amongst SCI staff after the Final Report on the 2017 crisis was released. No efforts were made to address these issues at SCI, despite every staffing position being available and filled by anyone hired by DDOC, including JTVCC staff.

THIRTY FIVE

146. The john doe defendants 71 - 73 each violated the First Amendment's right to free exercise of religion by failing to train staff to understand the sincerely held belief standards when determining religious requests for plaintiffs. As such, no requests for a kosher diet are approved, and the DOC is not properly following their own policies concerning religious diets.

147. Defendants Censini and Taylor both violated the 8TH amendments by failing to prevent acts of violating privacy concerning healthcare by way of HIPAA by not instructing the nursing staff to maintain all printedout medication lists for patients (plaintiffs) showing for easy reading of private medical information. These printed out papers are placed right in between the nurses and plaintiffs.

148 Defendants violate the 8TH Amendment by segregating every plaintiff who is taking the MAT's and distributing them at an hour when no other medications are distributed. They do this solely

THIRTY SIX

to make the process of being treated with MATs an irritant to everyone in order to pressure plaintiffs to quit the treatment. Celesini and Taylor both agree that usage of MATs is not really a medically necessary treatment but do not have the political clout to stand against MATs alone on morals. Instead, they devise underhanded methods of disportion, including isolating the individuals on MATs to a defined time so that everyone knows what inmates are on MATs. This is done with three distinct and violative purposes:

A. The times medication is given for MATs is the most aggravating time they can make it in order to trick people into missing the med pass because it is such an odd time (3:30 to 4:00 AM). The men often miss the medication because they are asleep.

B. By conducting the medication time at this hour, it creates a dangerous target on those who are

THIRTY SEVEN

prescribed the MAT[s] because other men are forced awake when the officer yells at 3:30 AM "MED-ICATION!!!" This creates hatred and animosity amongst the population, when reasonable med times are much easier to conduct and less intensive.

      C. Because everyone knows the people who respond to the officer yelling at 3:30 AM for medication are on MAT[s], some individuals who don't wish to be seen as an addict, haven't faced their weakness, for any reason, will never get treatment, because it becomes part of one's identity.

These reasons taken alone are sufficient to claim violations of 8th, 5th, & 14th Amendments, but taken together it gives more weight to the cultural claims.


149. Defendants 1-100 Does violated the plaintiffs' Constitutional rights by participating in the collective sabotage of administering MAT[s] as a medical treatment option. These defendants call the MAT[s] "fake news" as a jab at some childish political statement.

THIRTY EIGHT

it is an embarrassing display, but it is just too dangerous to be acceptable. These violations of sabotage are going to get somebody killed again.

# RELIEF

150. The plaintiffs relief requests are very unique. These types of relief will require collaborative effort on behalf of many individuals.

151. As the Plaintiff Representative has learned very clearly, he does not know much of anything. As a nod to this, and in deference to the spirit of Delaware government as an intended ally, the Plaintiff asks for no punitive damages.

152. To begin, punitives are quite appropriate for a case such as this, especially given the historical context prior to 2017 and the findings afterward.

153. Despite the arguable availability, as well as

THIRTY NINE

the belief that they are warranted, there will be no demand for punitives. At least not upon belief of mediation or some level of cooperation.

154. As the sheer scale of this pleading is intended to be transformative, the compensatory damages cannot be calculated properly, because there is to many variables. As such, compensatory damages computations must be held in abeyance, with a calculation estimate for cooperative mediation and one for forced arbitration.

155. Without question, should the DDOC be interested in structuring a form of open dialogue to effectuate fundamental progress there will likely always be an eager plaintiff waiting with open arms. This is not open-ended with complete deference, but it is a gesture of substantial obeisance.

156. To convey the proper aim for this claim, the representative plaintiff requests a

FORTY

nominal judgment for damages for
the violation of the 5th and 14th Amend
ments of $1.00.

157. As this case progresses, it will be
a matter in flux for damages' computation.

# DECLARATION / VERIFICATION

158. I, Donald Parkell, hereby declare
and verify, under the full penalty for
perjury under the laws of the United
States of America, that the foregoing is
true and correct.

Respectfully Submitted
Donald Parkell

500 PO Box
Georgetown, De. 19947
MAY 9TH, 2025

FORTY ONE